# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

HAWARD B. LYONS,

                **Plaintiff,**

-vs-                                  **Case No.  6:06-cv-177-Orl-JGG**

COMMISSIONER SOCIAL SECURITY,

                **Defendant.**

_____

## MEMORANDUM OF DECISION

      Plaintiff Haward Lyons ["Lyons"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for supplemental security income benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.     PROCEDURAL HISTORY

      Prior to June 1999, Lyons filed a claim for disability as a child due to mental retardation.  R. 428.  The Social Security Administration found Lyons disabled, and awarded supplemental security income benefits from 1992 through 1997. R. 428, 567.  On January 1, 1997, Lyons became ineligible for benefits due to "excess resources."  R. 567.

      On June 1, 1999, Lyons protectively filed a claim for supplemental security income benefits ["SSI"] claiming disability as of June 13, 1982 due to seizure disorder and deficits in intellectual functioning.  R. 62-64.  His claim was denied initially, and upon reconsideration.  R. 29-30, 32-33. On March 22, 2001, Linda R. Haack, Administrative Law Judge ["ALJ"], held a hearing on Lyons'

claim in Daytona, Florida.  R. 424.  Attorney Robert Ginsberg represented Lyons at the hearing.  *Id.*
At the hearing, Lyons's counsel agreed to amend Lyons' alleged onset date from June 13, 1982 (when
Lyons was one year old) to June 1, 1999 (his protective filing date).  R. 428.  The hearing ran past the
time allotted.  *See* R. 454-55.  The ALJ therefore adjourned before she could hear testimony from a
vocational expert ["VE"], and continued the hearing to a later date.  *See* R. 455-56.

On December 20, 2001, the ALJ held the second hearing on Lyons' claim in Daytona Beach,
Florida.  R. 458-505.  Attorney Ginsberg again represented Lyons at the hearing.  R. 458.  During this
hearing, the ALJ heard testimony from Lyons and Jackson McKay, an impartial vocational expert.
R. 459.

On May 24, 2002, the ALJ held a third hearing on Lyons' claim in Daytona Beach, Florida.
R. 506.  The ALJ scheduled the third hearing "to give [attorney Ginsberg] the opportunity to ask any
questions which he might have based upon some new evidence" submitted by Lyons in support of his
claim.  R. 508.  At the third hearing, the ALJ heard testimony from Lyons and Fred Collins, another
impartial vocational expert.  R. 507, 524.

On August 22, 2002, the ALJ issued a decision that Lyons was not disabled and not entitled
to benefits.  R. 15-22.  Following a review of the medical and other record evidence, the ALJ found
that Lyons retained the residual functional capacity ["RFC"] to perform unskilled work "on a sustained
basis at every level of exertion, but [that Lyons] must avoid driving, dangerous and moving
equipment, and unprotected heights."  R. 21, Finding 4.  After hearing the testimony of two VE's, the
ALJ further found that Lyons was able to perform his past work as a "motel cleaner," as well as work

as a cloth folder and hand packer.  R. 20-21.  The ALJ concluded that Lyons was not disabled.  R. 20, 21, Finding 10.

On December 13, 2005, the Appeals Council denied review.  R. 6-8.[1]  On February 14, 2006, Lyons timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1.  On November 13, 2006, Lyons filed in this Court a memorandum of law in support of his appeal.  Docket No. 31.  On January 26, 2007, the Commissioner filed a memorandum in support of her decision that Lyons was not disabled.  Docket No. 36.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Lyons appears[2] to assign six errors to the Commissioner.  First, Lyons argues that because Lyons was previously found disabled as a "child," the Commissioner erred by failing to evaluate Lyons' application under the "proper procedures."  Docket No. 31 at 1-2.  Second, Lyons claims that the Commissioner erred by failing to obtain the opinion and testimony of a "medical expert."  *Id.* at 14-15.  Third, Lyons claims that the Commissioner erred by failing to properly evaluate Lyons' pain and other subjective complaints.  *Id.* at 15.  Fourth, Lyons argues that the Commissioner improperly rejected the opinions of Lyons' treating physicians.  *Id.* at 16-22.  Fifth, Lyons argues that the Commissioner's findings on Lyons' RFC are not based on substantial evidence .  *Id.* at 22-23.  Sixth,

---

[1]Lyons submitted to the Appeals Council a brief in support of his appeal, but no new evidence.  *See* R. 6-8, 533-66.

[2]Lyons' memorandum in support of his appeal is confusing.  At the beginning of his memorandum, he lists approximately twenty-two errors by the Commissioner.  *See* Docket No. 31 at 1-4.  In the "Argument" section of his memorandum, Lyons, however, did not address or provide argument or authority for most of these twenty-two issues.  *See id.* at 14-23.  Instead, Lyons included three headings which list errors he assigns to the Commissioner.  *Id.*  Even then, his statement of the errors in his headings do not correspond to the arguments under the headings.  *See id.*  The Court therefore addresses below only what appear to be Lyons' six main arguments.  The Court, in fact, gave Lyons the benefit of the doubt by delineating six issues since Lyons failed to support some of his arguments with substantive argument or citations to relevant authority supporting his positions.

Lyons claims that the Commissioner erred by failing to meet her burden to demonstrate that Lyons could perform other work. *Id.* at 3, 22-23.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that she followed the proper procedures for determining Lyons' disability as an adult. Docket No. 36 at 4-7. Second, the Commissioner argues that the ALJ was not required to obtain the opinion of or testimony by a medical expert. *Id.* at 10-11. Third, the Commissioner argues that the ALJ properly evaluated Lyons' subjective complaints. *Id.* at 11-12. Fourth, the Commissioner counters that the ALJ properly evaluated the opinions of Lyons' treating physicians. *Id.* at 11-16. Fifth, the Commissioner argues that substantial evidence supports the ALJ's RFC findings. *Id.* at 17-18. Sixth, the Commissioner argues that the ALJ's hypothetical question posed to the VE accurately captured Lyons' impairments and limitations. *Id.* at 18-19.

## III.   THE STANDARD OF REVIEW

### A.   AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

**B.    REVERSAL**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health & Human Serv.*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the

claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where

the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability,

*Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.   REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four

of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson*

*v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the

district court must either find that the Commissioner's decision is not supported by substantial

evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.

*Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record

of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir.

1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for

district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-

four remand may be appropriate to allow the Commissioner to explain the basis for his decision.

*Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ

to explain his basis for determining that claimant's depression did not significantly affect her ability

to work) (treating psychologist acknowledged that claimant had improved in response to treatment and

could work in a supportive, non-competitive, tailor-made work environment).   On remand under

sentence four, the ALJ should review the case on a complete record, including any new material

evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to

consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).   After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

> In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health & Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[3] *Id.*

---

[3]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.   DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all

---

Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits.  *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

### B.      THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and

well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Comm'r*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether a claimant can perform past relevant work despite his or her impairment.  20 C.F.R. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.R. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy.  SSR  82-61.  In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.R. § 404.1567.

The claimant must prove disability on or before the last day of his or  her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v.*

*Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c).  If a claimant

becomes disabled after losing insured status, the claim for disability benefits must be denied despite

the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v.*

*Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof

shifts to the Commissioner to establish that the claimant could perform other work that exists in the

national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the

Commissioner has met this burden, the ALJ must develop a full record regarding the vocational

opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201

(11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-

Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an

exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P,

Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983)

(exclusive reliance on the grids is appropriate in cases involving only exertional impairments,

impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full

range of work at a given residual functional level or when a claimant has a non-exertional impairment

that significantly limits basic work skills."  *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).

In almost all of such cases, the Commissioner's burden can be met only through the use of a

vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.     TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Comm'r of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

-12-

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a

-13-

physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.    PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.   CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health & Human Serv.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### H.    THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

-16-

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work).  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living;  social

-17-

functioning;  concentration, persistence and pace;  or ability to tolerate increased mental demands (stress). This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not adequately describe these individuals' sustained ability to function. It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1. While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of

impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

## V.  **APPLICATION AND ANALYSIS**

### A.    **THE FACTS**

Lyons was born on June 13, 1981.  R. 64.  Lyons turned eighteen years-old four days after he protectively filed his application for benefits on June 9, 1999.  R. 62.  He was twenty-one years old on the date of the ALJ's decision to deny benefits.  R. 21-22.  Lyons completed eleventh grade,[4] and has work experience as a worker at a fast-food restaurant, a dishwasher, and a motel cleaner.  R. 67, 72, 437.  Around October and November of 2000, Lyons worked as dishwasher for four weeks, R. 467; and around June or July of 2001, he worked in housekeeping at a motel for two weeks, R. 461, 465.

Lyons began having seizures in his early childhood.  R. 170, 248.  When he was two years-old, Lyons accidentally ingested twenty-seven Dilantin tablets, and was admitted to the hospital for two weeks.  R. 248.  As a result, Lyons experienced significant problems with his motor skills, which lessened over time.  *Id.*  In addition, he stopped having seizures until he was twelve years-old.  *Id.*

In August 1998, Lyons sought treatment with Pashant DeSai, M.D., at the Neurology Clinic at Children's Medical Services, Department of Health ["Neurology Clinic"].  R. 242-43.  Dr. DeSai noted that Lyons was returning to the Neurology Clinic after three months, and that he had been

---

[4]At the March 22, 2001 hearing (the first ALJ hearing), Lyons testified that he graduated from high school, but then stated that he was "homebound" in eleventh grade, and that his school never sent him a diploma. R. 435-36.  The ALJ suggested that Lyons' counsel supplement the record to show that Lyons graduated from high school. R. 436.  The record contains no supplementation demonstrating that Lyons completed high school.  In her decision to deny benefits, the ALJ, without citation to the record, stated that Lyons "completed high school."  R. 20.

"tapered off Dilantin successfully earlier this year." R. 242.  The doctor also stated that Lyons had recently been "tapered off Depakote."  *Id.*  Lyons remained on Tegretol therapy, and Dr. DeSai observed that "[t]here have been no new seizures."  *Id.*  The doctor recommended that Lyons continue taking Tegretol, and follow-up at the Neurology Clinic in six months.  *Id.*

In October 1998, while he was in eleventh grade, Lyons underwent a psychological evaluation with his School Psychological Services, School District of Volusia County, Florida, because of "behavioral concerns." R. 162-68.  Psychologist Cecile M. Ropelis administered the testing over the course of three days in October.  *Id.*  Ropelis noted that Lyons previously underwent testing in November 1996, and that the prior evaluation showed the "[b]orderline range of intellectual ability." *Id.*  The October 1998 tests indicated "weak reading and spelling skills" and "some concerns relating to inappropriate behavior and a tendency to internalize problems." R. 164.  The results also indicated "high elevations of aggression and concerns over social skills."  *Id.*  Ropelis suggested that the school further evaluate Lyons' "need for special services."  *Id.*

On December 11, 1998, Lyons returned to Dr. DeSai at the Neurology Clinic.  R. 236-67.  The doctor stated that Lyons was "known to have the following chronic problems: 1. Idiopathic childhood epilepsy[, and] 2. Chronic major behavioral troubles, with a past history of irregular medication compliance, as well as substance abuse." R. 236.  Lyons reported having had twelve seizures since his last visit with Dr. DeSai (four months prior).  *Id.*  The seizures mostly occurred at night, and were "brief grand mal convulsions, with relatively quick recovery within about [ten] minutes."  *Id.*  One or two of the seizures occurred while Lyons was awake, and on "rare occasions," Lyons drooled or experienced incontinence during the seizures.  *Id.*  Dr. DeSai recommended that Lyons begin taking

Neurtontin (seizure medication), and increased Lyons' dosage of Tegretol (anticonvulsant medication). R. 237.  Dr. DeSai further stated that Lyons was "angry," and that if he continued to be "angry," the doctor would stop treating him.  *Id.*

On February 17, 1999, Lyons went to the Halifax Medical Center emergency room with complaints of pain in his right shoulder.  R. 223-24.  He stated that he fell on his right shoulder and dislocated it, but that he "popped [the shoulder] back in again."  R. 223.  He did not state that the injury was related to a seizures.  *See* R. 223-24.  A physical examination showed mild tenderness, but Lyons had full range of motion of his shoulder.  R. 223.  An X-ray of his shoulder was unremarkable. *Id.*  The doctor gave him a sling, and diagnosed right shoulder pain with possible dislocation.  *Id.*  On discharge, the doctor instructed Lyons to use an ice pack and Motrin for the pain.  R. 224.

On February 25, 1999, Lyons was brought by ambulance to the Halifax Medical Center emergency room because of "seizure activity."  R. 216-18.  Lyons reported a history of asthma, and also stated that he smoked cigarettes.  R. 217.  Lyons and his mother stated that Lyons had been taking his medication regularly.  *Id.*  Lyons' Tegretol level was 2.0, "which is subtherapeutic."  *Id.*  The doctor diagnosed "seizure disorder"; gave Lyons 600 milligrams of Tegretol; and discharged Lyons the same day.  R. 218.

On March 14, 1999, Lyons was again admitted to the Halifax Medical Center emergency room. R. 210.  The doctor was unable to obtain a "review of systems" from Lyons because he was "postictal."[5]  *Id.*  His Tegretol level was "sub-therapeutic at 2.2."  *Id.*  Lyons received 400 milligrams

---

[5]"Postictal" is defined as "[f]ollowing as seizure, *e.g.*, epileptic."  STEDMAN'S MEDICAL DICTIONARY 1413 (26th ed. 1995) ["STEDMAN'S"].

of Tegretol, and was discharged on March 15, 1999.  R. 209, 211  The doctor instructed Lyons to continue taking Tegretol.  *Id.*

On April 7, 1999, Lyons returned to Dr. DeSai for a follow-up appointment.  R. 233-34.  Dr. DeSai noted Lyons' history of idiopathic childhood epilepsy; normal electroencephalograms in 1996, 1997, and 1998; normal CT scan results; "[c]hronic major behavior and attitude problems [and] [p]ast history of irregular medication compliance and substance abuse."  R. 233.  Lyons reported having seven seizures while he was sleeping (during the day and night).  *Id.*  He described the seizures as "brief grand mal convulsions" that lasted two to three minutes, each of which were followed by a postical phase of up to one hour.  *Id.*  Dr. DeSai recommended that Lyons stop taking Neurontin; continue taking Tegretol; and begin taking Lamictal (seizure medication).  R. 234.  The doctor further stated that if Lyons continued to have seizures, he would be referred for a second opinion.  *Id.*

Lyons alleged onset date is June 1, 1999 (his protective filing date).  R. 428.  At the request of the Office of Disability Determinations, on August 11, 1999, Malcom J. Graham, III, Ph.D., a clinical psychologist, performed a "General Clinical Evaluation with Mental Status" and "General Intellectual Evaluation" of Lyons.  R. 169-73.  Lyons told Dr. Graham that he had one beer the previous month, and that he last smoked marijuana two weeks prior to the visit.  R. 170.  Dr. Graham noted that "this [report on alcohol and drug use] may not be accurate."  *Id.*  IQ tests showed a Verbal Scale IQ of 76, a Performance Scale IQ of 79, and a Full Scale IQ of 76.  R. 172.  Dr. Graham assessed: "No diagnosis" at Axis I[6]; "Borderline intellectual functioning"[7] on Axis II; "Seizure

---

[6]The DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"] describes the five axes included in "the DSM-IV multiaxial classification" as:

Axis I    Clinical Disorders; Other Conditions That May Be a Focus of Clinical Attention
Axis II   Personality Disorders

disorder and asthma by report" on Axis III; "None" at Axis IV; and a "Current GAF" of 70-75 and a "Highest GAF Past Year" of 70-75[8] on Axis V. *Id.* Dr. Graham stated that Lyons' prognosis was "[g]uarded to good." *Id.* The doctor opined: "As long as [Lyons] is not abusing drugs or alcohol, he is capable of managing his own funds." *Id.* Dr. Graham further stated that he noted "no problems" in his attention or concentration or in his recent or remote memory, and "no behavioral indications of anxiety, depression or thought disorder." R. 173. Dr. Graham also stated that "at the present time, [Lyons] is functioning in the borderline range of intellectual ability . . ." and that "[i]f he can keep himself out of trouble and free from the criminal justice system, he may graduate from high school." *Id.*

On September 2, 1999, a non-examining state agency psychologist assessed Lyons' mental impairments and mental RFC. R. 182-92. In the "Psychiatric Review Technique" form, the psychologist opined that Lyons' mental retardation was a "severe impairment" that "did not meet or equal [the Listings]." R. 186. Under the heading "Mental Retardation and Autism," the psychologist checked the box for:

---

Axis III   General Medical Conditions
Axis IV   Psychosocial and Environmental Problems
Axis V    Global Assessment of Functioning.

DSM-IV at 25.

[7]An individual with "Borderline Intellectual Functioning" has an IQ in the 71-84 range, where a person with "Metal Retardation" has an IQ of 70 or below. *See* DSM-IV at 684.

[8]The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. DSM-IV at 32. A GAF code of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household). *Id.* In general, a person with this score is functioning "pretty well" and "has some meaningful interpersonal relationships. *Id.* A GAF code of 71 to 80 is better — the individual has, if symptoms are present, transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument), and slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork.). *Id.*

> [s]ignificantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period . . . or pervasive developmental disorder characterized by social and significant communicative deficits originating in the developmental period, as evidenced by . . . [borderline intellectual functioning].

R. 188.  The psychologist opined, however, that Lyons had "slight" limitations in his activities of daily living; "moderate" difficulties in maintaining social functioning; and never had episodes of decompensation.  R. 191.  Lyons "often" had deficiencies of concentration, persistence, or pace, resulting in the failure to complete tasks in a timely manner.  *Id.*

In the "Mental Residual Functional Capacity Assessment" form (also dated September 2, 1999), the same non-examining state agency psychologist stated that Lyons was "not significantly limited" in most of his abilities related to understanding, memory, sustained concentration, persistence, social interaction, and adaptation.  *See* R. 182-83.  Lyons, however, was "moderately limited" is his abilities to: understand and remember detailed instructions; carry out detailed instructions; "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; accept instructions and respond appropriately to criticism from supervisors; and set realistic goals or make plans independently of others.  *Id.*  The psychologist explained that Lyons' ability to learn "complex or lengthy" information was "limited," but that "[n]evertheless, [Lyons] appears able to meet the mental demands of simple task activity which has clearly structured performance expectations so as to limit the need for criticism or correction."  R. 184.  The psychologist added that Lyons "[m]ay also benefit from assistance with appropriate goal setting at this time."  *Id.*

On September 11, 1999, a non-examining state agency physician assessed Lyons' physical RFC. R. 174-81. Lyons had no exertional limitations (*i.e.*, he had no limitations in his abilities to lift, carry, stand, walk, sit, push, and pull). R. 175. He further had no manipulative, visual, or communicative limitations. R. 177-78. Lyons, however, could never climb ladders and had to avoid all exposure to hazards (such as machinery, heights, etc.). R. 176, 178.

On September 19, 1999, Lyons' mother brought Lyons to the Halifax Medical Center emergency room. R. 198. Lyons' mother told the doctors that Lyons had a seizure at 3:00 AM that morning, and that he had been lethargic and dizzy since the seizure. *Id.* R. 199-201. Omar Adams, M.D., examined Lyons. R. 200-01. The physical examination and CT scan were normal. R. 200, 203. His Tegretol level was 7.8 "with a normal range [being from] 4-10." R. 200. Dr. Adams diagnosed a history of seizure disorder and lethargy "secondary to elevated Tegretol level." *Id.* The doctor instructed Lyons' mother to "hold Tegretol today" and to talk to Lyons' primary care physician about discontinuing use of Tegretol until Lyons' Tegretol level was "back down to normal range." R. 200. Lyons was discharged the same day in good condition. R. 201.

On October 6, 1999, Lyons saw Dr. DeSai. R. 230-32. Dr. DeSai, again, noted that Lyons had idiopathic childhood epilepsy and a history of "chronic major behavior problems, irregular medication compliance, and substance abuse." R. 230. He told the doctor that during the previous six months, he had "only one flurry of seizures which occurred over the course of one weekend about [three] weeks ago." *Id.* He reported experiencing three grand mal seizures. *Id.* Dr. DeSai assessed:

> Significantly improved seizure control in the last 6 months after substituting Neurontin with Lamictal in April 1999. There have been no significant seizures, except for one flurry of 3 grand mal convulsions in September . . . This latest seizure flurry indicates

-26-

> that while seizure control has improved dramatically, it is still not optimal. [Lyons']
> mother is amenable to dosage adjustment.

R. 231.  The doctor recommended that Lyons continue taking Tegretol and an increased dosage of Lamictal.  R. 232.  Dr. DeSai further noted that Lyons would benefit from a "second neurological opinion," and agreed to schedule an appointment for Lyons.  *Id.*  Dr. DeSai also stated: "[Lyons] remains fully functional.  He is able to participate in all normal physical activities for his age, and he remains independent in his activities of daily living."  R. 230.

On November 30, 1999, upon referral from Dr. Desai, Lyons was evaluated at the Pediatric Neurology Clinic and Shands Children's Hospital and the University of Florida ["Shands"].  R. 245-47.  Paul R. Carney, M.D., performed the evaluation.  R. 248-50.  Lyons told Dr. Carney that he drinks alcohol "occasionally to drunkenness although not frequently" and that he has smoked one pack of cigarettes per day since he was fifteen.  R. 246.  Dr. Carney assessed a "history of intractable seizures"; discussed with Lyons various treatment options, including surgery for epilepsy or using new seizure medications; and instructed Lyons' mother to increase Lyons' dosage of Tegretol by 200 milligrams at night.  *Id.*  In a letter addressed to Dr. Desai, Dr. Carney stated that at that time, Lyons reported having at least three seizures each month.  R. 248.  Dr. Carney also noted that Lyons reported visual hallucinations prior to seizures, and that Lyons' mother had described a recent seizure in which Lyons was "unresponsive, staring, and having manual automatisms."  *Id.*

On December 26, 1999, a second non-examining state agency physician assessed Lyons' physical RFC.  R. 265-72.  According to the physician, Lyons had no exertional, manipulative, visual, or communicative limitations.  R. 266, 268-69.  Lyons had to avoid concentrated exposure to hazards

(such as machinery, heights, etc.), but had no other environmental limitations.  R. 269.  He could never climb ladders, but could frequently balance, stoop, kneel, crouch, and crawl.  R. 267.

From February 1, 2000 through February 11, 2000, Lyons underwent testing at Shands for his "[i]ntractable seizures."  R. 273-78.  Dr. Carney "weaned" Lyons off of Lamictal and Tegretol by February 4, 2000, and Lyons had two generalized tonic-clonic seizures on February 7, 2000.  R. 273.  The doctor treated both seizures with Ativan medication, and put Lyons back on Tegretol and Lamictol before his discharge.  *Id.*

On February 8, 2000, Duane E. Dede, Ph.D. (Clinical Associate Professor in Clinical and Health Psychology at Shands) performed a neuropsychological evaluation as part of Lyons' evaluation for epilepsy surgery at Shands.  R. 315-19.  Lyons told Dr. Dede that he smokes a half a pack of cigarettes per day, and drinks alcohol.  R. 316.  Dr. Dede noted that Lyons' "report of the quantity of alcohol [Lyons] consumes daily is believed to be inaccurate and unreliable."  *Id.*  Lyons denied using drugs.  *Id.*  Upon observing Lyons, Dr. Dede noted in his evaluation report: "Although it is believed that the following assessment results are a reasonably accurate reflection of [Lyons'] current level of functioning, some interpretive caution is warranted due to [Lyons'] sleepiness and poor mood during this evaluation."  *Id.*

Lyons' IQ test results revealed a "Full Scale IQ of 64 (Mentally-Impaired range), a Verbal IQ of 70 (Borderline-Impaired range), and a Performance IQ of 63 (Mentally-Impaired range).  *Id.*  Dr. Dede stated that "[t]hese scores indicate significant general intellectual impairment."  *Id.*  Dr. Dede also stated that Lyons showed impairment in his attention and memory, concept-formation and reasoning, language processing and reasoning, and visual perception skills.  R. 317-18.  Lyons,

however, demonstrated the ability to comprehend and respond to simple instructions, and Dr. Dede

stated that Lyons "may be better able to comprehend information that is spoken to him than when

information is conveyed by some other means." R. 318.

The doctor diagnosed "Deferred" on Axis I, "Mental Retardation" on Axis II, and "Epilepsy"

on Axis III. R. 319. Dr. Dede again noted that Lyons "was lethargic and often in a poor mood during

this assessment and therefore, these results may slightly underestimate his true level of functioning."

*Id.* Dr. Dede next stated: "However, the results are remarkably consistent across tasks measuring

similar cognitive functions, as well as with Mrs. Lyons' reports about her son's abilities." *Id.* On

Lyons' discharge from Shands on February 11, 2000, Dr. Carney noted that Lyons' condition was

"good," and stated that Shands would contact Lyons about the possibility of epilepsy surgery. R. 273-

74.

On April 14, 2000, Lyons went to the Halifax Medical Center emergency room, complaining

that he had a seizure earlier that evening, and that he was not "feeling well." R. 358. Lyons admitted

occasional alcohol use, but denied using drugs. *Id.* His Dilantin level was at 0.8, and his Tegretol

level was at 1. R. 359. The doctor diagnosed "Seizure disorder, non compliance." *Id.* The doctor

recommended that Lyons take his medications; follow-up with his primary care physician; return "as

needed"; take "seizure precautions"; and told Lyons not to drive. R. 360.

On May 24, 2000, Lyons visited Dr. DeSai. R. 289-90. Lyons' mother told Dr. DeSai that she

and Lyons were "thinking of proceeding with epilepsy surgery [at Shands], but it has not been

finalized." R. 290. Lyons was due for more tests at Shands in June. *Id.* Dr. DeSai stated that Lyons

had idiopathic childhood epilepsy and "Chronic behavior troubles, irregular medication compliance

-29-

and history of substance abuse." R. 290. Dr. DeSai assessed "Intermittent breakthrough seizures," and stated that since Shands doctors were evaluating Lyons, Lyons should remain on his current dosage of medications. R. 289.

On July 3, 2000, Lyons had a two-minute seizure (reportedly witnessed by two family members), and went to the Halifax Medical Center emergency room. R. 347. Lyons reported taking his Tegretol and Lamictal medications "faithfully." *Id.* The doctor noted, however, that "a count of the pills in his bottles brought with him states that he really has not been taking any of it at all. The prescription is almost a month old and only a few pills are missing from each bottle." *Id.* Lyons denied using alcohol or drugs. His Tegretol level was less than 0.3, and his "[m]etabolic panel" was normal. R. 348. The doctor assessed "Seizure disorder, noncompliant," and stressed to Lyons that he needed to take his medications as prescribed. *Id.*

Lyons returned to the Halifax Medical Center emergency room on September 5, 2000. R. 342-44. He stated that he had not had a seizure for six to eight months, but that he had two seizures in the prior two days. R. 343. He also reported drinking alcohol a few days prior "which he [thought] might have contributed to his seizure breakthrough." *Id.* Tests showed that Lyons was negative for alcohol, and that he was "at the low end of the therapeutic range on the Tegretol at 4.1, with therapeutic being 4-10." The doctor diagnosed "Seizure disorder, having breakthrough seizures." R. 344. The doctor also recommended that Lyons continue taking his medications, and follow-up with Dr. DeSai. *Id.*

Lyons went to Halifax Medical Center again on September 21, 2000. R. 337-39. He complained that he felt "strange"; was having difficulty walking; and was experiencing numbness on his right side. R. 338. The doctor diagnosed sensory deficits on his right side which had improved;

seizure disorder which was "stable"; and a subtherapeutic Dilantin level.  R. 339.  The doctor

instructed Lyons to continue taking Dilantin.  *Id.*

On October 1, 2000, Lyons returned to the Halifax Medical Center emergency room.  R. 291-

92.  He informed the doctor that he had seizure that morning and another two hours before arriving

at the hospital. R. 291.  His Tegretol level was at 1.1.  R. 292.  The doctor assessed "Seizure disorder

with inadequate medication control."  *Id.*  Lyons received Tegretol, and was discharged with

instructions to increase his Tegretol dosage, and to follow-up with Dr. DeSai.  *Id.*

On November 15, 2000, Lyons visited Dr. DeSai.  R. 286-87.  Dr. DeSai's assessment was

that Lyons "continues to have intermittent breakthrough seizures described as grand mal convulsions

lasting a minute or two followed by a postictal phase and no recall of the event."  R. 287.  The doctor

described Lyons "general condition" as "otherwise stable."  *Id.*  Dr. DeSai also recommended that

Lyons continue to take Tegretol, and begin taking Topamax medication.  *Id.*  The doctor noted that

"while [Lyons] is still having intermittent convulsions, a total of six or seven this calendar year, it is

far less than what he used to have in years [past]."  *Id.*  The doctor also noted:

> Due to practical considerations, [Lyons'] mother has had to cancel her appointments
> at [Shands] for further consideration of epilepsy surgery . . . [Lyons and his mother]
> still want to go ahead with epilepsy surgery, but mother will do it as soon as it is
> practically feasible for her.

*Id.*

On February 1, 2001, Lyons went to the Halifax Medical Center emergency room with

complaints of shakiness and nausea.  R. 327.  The doctor noted that Lyons' Lamictal level was 0.5

and that the "level should be 15-40."  R. 328.  The diagnosis was "[a]cute exacerbation of chronic

seizure disorder, with subtherapeutic anticonvulsant Lamictal level." *Id.* The doctor advised Lyons to increase his dosage of Lamictal, and discharged him in "stable condition." *Id.*

Lyons returned to the Halifax Medical Center emergency room on March 15, 2001 after experiencing a seizure. R. 319A-23. His Tegretol level was at 1.8. R. 322. The doctor diagnosed seizure disorder and a subtherapeutic Tegretol level, and advised Lyons to take two extra doses of his medication that evening. R. 323. Lyons received discharge instructions informing him that he had a seizure because his medicine level was too low, and that it was important that he take his medicine as prescribed. R. 303.

On March 22, 2001, Lyons testified at the first hearing before the ALJ. R. 424. At the beginning of the hearing, Lyons' counsel agreed to amend Lyons' alleged onset date from June 13, 1982 to June 1, 1999. R. 428. Lyons testified that he graduated from high school, but that his school never sent him his diploma. R. 435. He also testified that he knew how to read, write, add, and subtract. R. 436. He stated that he worked as a dishwasher in a restaurant for two weeks in 2000, but that he stopped working because he missed several days of work because of his seizures. R. 437-39.

He testified that, after a seizure, his family has to help him to the bathroom. R. 440. He also mentioned that his metabolism "just eat [sic] the [seizure] medicine." R. 440-41. He stated that he takes his medication, but that he will still have a grand mal or petit mal seizure "sometimes." R. 441. Lyons reported that he may not have a grand mal seizure for six months, but that he has petit mal seizures two times a month. R. 443-44. The petit mal seizures last a "split second." R. 444. He stated that the petit mal seizures were like staring spells. *Id.* He lives with his mother; is able to

perform chores around the house; and helps take care of four children between the ages of five and eleven.  R. 445-46.

Because the hearing ran past the allotted time, the ALJ continued the hearing to a later date to hear testimony from a VE.  R. 455-56.  The ALJ told Lyons' counsel to submit information from treating physicians on the effects of Lyons' medications, and informed counsel that "the outcome of this is going to depend to a fair extent on what the doctors say about his medication."  R. 455.

After the first ALJ hearing, on November 28, 2001, Lyons visited Dr. DeSai.  R. 405-06. Lyons reported having only one seizure during the previous six months. R. 405.  The seizure occurred while he was sleeping; lasted a few minutes; and did not require "acute" medical attention.  *Id.* Lyons' mother stated that Lyons had slurred speech and an unsteady gait two days prior, but that he returned to "normal" within a few hours after she withheld his morning medication.  *Id.*  Dr. DeSai stated that Lyons had idiopathic childhood epilepsy, "Mild mental impairment," "Chronic irregular medication compliance," and a history of "substance abuse and alcohol [sic]."  *Id.*

In his assessment, Dr. DeSai stated "Surprisingly enough, his seizures have been very well controlled in the last six months, with only one seizure during that duration."  R. 406.  Dr. DeSai noted that Lyons was tolerating his medications well, and that he was unsure whether Lyons' slurred speech and unsteady gait were due to toxicity from the medication or "some other problem," noting that Lyons "is known to have a past history of substance abuse." R. 406.  The doctor told Lyons' mother to contact him if Lyons' speech and gait problems returned, and renewed Lyons' medication prescriptions.  *Id.*  The doctor also noted that Lyons never went back to Shands.  *Id.*

-33-

On December 20, 2001, the ALJ held a second hearing on Lyons' claim.  R. 458.  Lyons testified again.  R. 464-76.  He stated that he worked in housekeeping at a motel for two weeks around October or November of 2000, and did the same at another motel for two weeks around June or July of 2001.  R. 465-66.  Lyons testified that he takes his medication as directed by his doctors, but that he had a grand mal seizure a couple of days before the hearing.  R. 469.  He also testified that he had a petit mal seizure either two days or four months before the hearing.  R. 471.  He also testified that he has petit mal seizures "once every blue moon."  *Id.*  He described his petit mal seizures as lasting three to four minutes, and stated that he sees "dead people and stuff like that" before he has the grand mal seizures.  R. 471-72.  Lyons also stated that he plays basketball and spends time with his friends.  R. 474.

At the December 2001 hearing, the ALJ heard testimony from a VE McKay.  R. 480.  VE McKay testified that Lyons would be able to perform jobs as a motel cleaner (which is light, unskilled work), a cloth folder (which is light, unskilled work), and a hand packer (which is medium, unskilled work).  R. 483.

On February 7, 2002, Lyons visited the Halifax Medical Center emergency room.  R. 390-91. He stated that he thought he had "a walking seizure" that day and the day before.  R. 390.  Lyons' Tegretol level was at 8.8.  R. 391.  The doctor's impression was seizure and seizure disorder "by history."  *Id.*  Lyons was discharged without receiving treatment.  *Id.*  The doctor recommended that Lyons follow-up with Dr. DeSai.  *Id.*

On March 28, 2002, Jeff Oatley, Ph. D., performed a "Psychology Evaluation" at the request of the Office of Disability Determinations.  R. 384-87.  Lyons told Dr. Oatley that he had a seizure

a week before, and that he has seizures "a couple of times every [six] months." R. 384.  He also reported having asthma, but stated that he has not had an attack in years.  R. 385.  Dr. Oatley noted that Lyons did not have any severe deficits in speech, energy level, concentration, orientation, and memory.  R. 385.  IQ tests showed a Verbal IQ of 74, a Performance IQ of 80, and a Full Scale IQ of 75.  R. 386.  The doctor diagnosed Borderline Intellectual Functioning, Seizure Disorder, and "Noncompliance with Treatment, DSM-IV V15.81,[9] as indicated [by] repeated admission to E.R. for seizures, with labs [sic] showing subtherapeutic levels of antiseizure medications, indicating that Mr. Lyons has not been taking his medications as prescribed."  *Id.*

Dr. Oatley opined that Lyons' prognosis is "fair."  *Id.*  Dr. Oatley also completed an "Medical Assessment of Ability to Do Work-Related Activities (Mental).  R. 388-88A.  He opined that Lyons had "good" abilities to: follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; deal with work stress; function independently; and maintain attention or concentration.  R. 388.  He also opined that Lyons had a "fair" ability to understand, remember, and carry-out complex job instructions; "good" ability to understand, remember, and carry-out detailed, but not complex job instructions; and "unlimited ability" to understand, remember, and carry out simple job instructions.  R. 388A.  Lyons further had "good" abilities to: maintain his personal appearance; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability.  *Id.*

On May 22, 2002, Lyons visited Dr. DeSai for a follow-up appointment.  R. 399-400.  Dr. DeSai stated that Lyons had idiopathic childhood epilepsy, "Mild mental impairment," "Chronic

---

[9]"Noncompliance With Treatment" is a "category [that] should be used only when the problem is sufficiently severe to warrant independent clinical attention."  DSM-IV at 683.

spotty medication compliance," and a history of "substance abuse and alcohol."  R. 399.  In his assessment, Dr. DeSai stated that "in the last year, [Lyons] had only four seizures which is much better compared to years past."  R. 400.  Dr. DeSai renewed Lyons' prescriptions for medications, and stated that because Lyons would soon turn twenty-one years old, he would be discharged from care at the Children's Medical Services Neurology Clinic.  *Id.*

The ALJ held a third hearing on May 24, 2002 to explore the medical records submitted to the ALJ since the previous hearing.  R. 508.  Lyons testified that six months before the hearing, he switched from Tegretol medication to the generic form of Tegretol.  R. 514-15.  He stated that he had problems with the generic medication, and that if he did not break the pills in half before taking them, he was unable to walk or talk.  R. 515-16.  Lyons testified that he took the prescribed dosage of medication, but that he broke the pills in half before ingesting them.  R. 516-19.  Lyons testified that he takes two naps each day (at 11:30 AM and 3:00 PM) because he is tired.  R. 522-23.  He also testified that he had a seizure one month before the hearing, and another seizure two weeks before the hearing.  R. 520.  Lyons stated that his seizures last for approximately three to five minutes, and he needs two or three days to recover from the seizures.  R. 524.  He testified that his family has to bring him food and help him to the bathroom after the seizures.  *Id.*

VE Collins also testified at the hearing.  R. 524.  VE Collins testified that if Lyons required two to three days to recover from seizures, he would not be able to work "on a regular and continuing basis . . ."  R. 525.  VE Collins also stated that if Lyons was required to take two naps each day, he would also not be able to "work on a regular and continuing basis . . ."  *Id.*

-36-

**B.     THE ANALYSIS**

As stated earlier, Lyons argues six main errors by the Commssioner.  First, Lyons argues that because Lyons was previously found disabled as a "child," the Commissioner erred by failing to evaluate Lyons' application under the "proper procedures."  Docket No. 31 at 1-2.  Second, Lyons claims that the Commissioner erred by failing to obtain the opinion of or testimony by a "medical expert."  *Id.* at 14-15.  Third, Lyons claims that the Commissioner erred by failing to properly evaluate Lyons' pain and other subjective complaints.  *Id.* at 15.  Fourth, Lyons argues that the Commissioner improperly rejected the opinions of Lyons' treating physicians.  *Id.* at 16-22.  Fifth, Lyons argues that the Commissioner's findings on Lyons' RFC are not based on substantial evidence .  *Id.* at 22-23.  Sixth, Lyons claims that the Commissioner erred by failing to meet her burden to demonstrate that Lyons could perform other work.  *Id.* at 3, 22-23.

1.     Redetermining Disability as an Adult

Lyons argues that because Lyons was previously found disabled as a "child," the Commissioner erred by failing to evaluate Lyons' application under the "proper procedures."  Docket No. 31 at 1-2.  The Commissioner argues that she followed the proper procedures for determining Lyons' disability as an adult.  Docket No. 36 at 4-7.

Lyons' argument is confusing.  Without offering any substantive argument or explanation, Lyons appears to make several conflicting arguments as to how the Commissioner erred by failing to evaluate Lyons' application under the "proper procedures."  Lyons seems to argue that the Commissioner erred by failing to: 1.) "redetermine" Lyons' eligibility for disability as an adult (pursuant to 42 U.S.C. § 1382c) because Lyons was previously found disabled as a child; 2.) notify

Lyons before "redetermining" his eligibility for disability as an adult (thereby violating Lyons' right to "due process"); 3.) "reopen" Lyons' prior 1992 disability determination for "good cause" shown (pursuant to 20 C.F.R. § 416.1488); or 4.) evaluate Lyons' 1999 claim using the rules pertaining to individuals under eighteen because Lyons protectively filed for benefits four days prior to his eighteenth birthday (pursuant to 20 C.F.R. § 416.924(f)). *See* Docket No. 31 at 1-2. Lyons is wrong as to all four arguments.

### a. Redetermining Eligibility

According to 42 U.S.C. § 1382c, "[i]f an individual is *eligible for benefits* . . . by reason of disability *for the month preceding* the month in which the individual attains the age of 18 years, the Commissioner shall redetermine such eligibility . . . by applying the criteria used in determining initial eligibility for individuals who are age 18 or older . . ." 42 U.S.C. § 1382c(a)(3)(H)(iii).

In this case, while he was under eighteen years old, Lyons received disability benefits due to mental retardation from 1992 through 1997. The benefits ended when he was no longer eligible for benefits "by reason of excess resources." R. 428, 567. Lyons was *not* eligible for benefits *for the month preceding* the month in which he turned eighteen years old, so "redetermining" his eligibility was not necessary. Even assuming redetermination was necessary pursuant to 42 U.S.C. § 1382c, it is unclear how the Commissioner erred since the ALJ applied the criteria used in determining eligibility for individuals who are over eighteen.[10] *See* R. 15-16; *see also* 20 C.F.R. § 416.920

---

[10]There does seem to have been some confusion as to whether this case involved redetermination of Lyons' eligibility as an adult. At the second hearing on December 20, 2001, the ALJ did state that "it's my understanding . . . that this is an Age 18 redetermination case . . ." R. 463. Lyons' counsel responded, "Yes." *Id.* The ALJ continued: "Which means that we will not be talking about medical improvement[;] we'll simply be talking about his conditions, is that your understanding?" *Id.* Counsel again responded, "Yes." *Id.* The ALJ stated: "Good. The general issue before me then . . . is whether you are disabled within the meaning of the Social Security Act. This means that you must have a medical problem or a combination of problems keeping you from working for 12 continuous months." *Id.* However, the ALJ's

(describing the five-step sequential evaluation process for adults).  In any event, Lyons' "due process" arguments are without merit.  Lyons himself protectively filed his application for benefits four days before his eighteenth birthday, R. 64, and he, in fact, never raised the due process argument before the ALJ.

### b.      Reopening a Prior Determination

Even in cases that do not involve "redetermining" eligibility, the Commissioner applies a general rule to all individuals (both under and over eighteen) — a determination may be "reopened" if "good cause" is shown to reopen the case, or if the determination was obtained "by fraud or similar fault."  20 C.F.R. § 416.1488.  "Good cause" to reopen a determination exists if: 1.) "[n]ew and material evidence is furnished"; 2.) a clerical error was made; or 3.) "[t]he evidence that was considered in making the determination or decision clearly shows on its face that an error was made."  20 C.F.R. § 416.1489(a).   Lyons made no attempt to articulate "good cause" or "fraud or similar fault" that would necessitate reopening his prior disability determination.  This argument is without merit.

### c.      Filing an Adult Claim Prior to the Eighteenth Birthday

Additionally, if a claimant turns eighteen *after* filing a disability application, but before the Commissioner makes a determination or decision, for the period during which the claimant is under eighteen, the Commissioner should evaluate disability using the rules for individuals under eighteen.  20 C.F.R. § 416.924(f).  For the period beginning with the claimant's eighteenth birthday, the Commissioner should evaluate disability using the rules for individuals over eighteen.  *Id.*

---

*written decision* evaluated Lyons using the criteria for determining eligibility for adults.  *See* R. 15-16.

In this case, Lyons turned eighteen years-old *four days* after he protectively filed his application for benefits on June 9, 1999. R. 62. He was twenty-one years old on the date of the ALJ's decision to deny benefits. R. 21-22. In her decision to deny benefits, the ALJ evaluated Lyons as an adult, but specifically found that Lyons did not have "an impairment or combination of impairments so severe as to meet or equal the severity of any impairment listed in [the listings."][11] R. 20. The ALJ's failure to evaluate Lyons as a child for the period of *four days* before Lyons turned eighteen is harmless error, and remand is not required on this issue.

2.   Medical Expert

Lyons next claims that the Commissioner erred by failing to obtain the opinion and testimony of a "medical expert." Docket No. 31 at 14-15. The Commissioner argues that the ALJ was not required to do so. Docket No. 36 at 10-11.

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917. In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay*, 848 F.2d at 1209.

Lyons' contention is without merit. Lyons was required to produce evidence to support his disability claim. The ALJ held three hearings in this case – each time giving Lyons' counsel the opportunity to submit additional records. *See, e.g.*, R. 511. Dr. Graham, *see* R. 169-73, and Dr.

[11]Under the regulations for determining *childhood* disability, the claimant must "meet, medically equal, or functionally equal the listings." 20 C.F.R. § 416.924(d).

Oatley, *see* R. 384-87, evaluated Lyons at the request of the Office of Disability Determinations. Lyons himself submitted numerous treatment notes from his treating physician Dr. DeSai and from his frequent visits to the Halifax Medical Center emergency room. The ALJ further heard testimony from two different VE's. The ALJ more than fulfilled her duty to conduct a full and fair inquiry in this case. Remand is not required.

3.    Lyons' Credibility and Subjective Complaints

Lyons also claims that the Commissioner erred by failing to properly evaluate Lyons' pain and other subjective complaints. Docket No. 31 at 15. The Commissioner argues that the ALJ properly evaluated Lyons' testimony and subjective complaints. Docket No. 36 at 11-12.

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562.

Lyons claims that the ALJ failed to properly evaluate Lyons' "subjective complaints of pain, loss of concentration, and memory on [sic] his ability to work." Docket No. 31 at 15. First, it is not

clear the Lyons even claimed disability due to pain. The record — including the treatment notes, consultative evaluations, and Lyons' own testimony at three hearings — contains very few references to pain. At most, Lyons complained of pain in his right shoulder on February 17, 1999. R. 223-24. His shoulder problem, however, was minor and temporary, and he did not report that he dislocated his shoulder during a seizure. *See id.*

Next, the ALJ articulated specific and adequate reasons for discrediting Lyons' testimony on his subjective complaints, impairments, and limitations. The ALJ conducted an exhaustive and thorough review of the medical evidence. R. 16-19. The ALJ found, *inter alia*, that Lyons gave inconsistent reports to doctors about the frequency of his seizures, R. 16; that numerous doctors repeatedly stated that Lyons was noncompliant with his medications, R. 16-17; that Dr. DeSai (Lyons' treating physician) opined that Lyons was "fully functional" in October 1999, R. 17; and that Lyons' performance varied on different IQ and performance tests, R. 17.

In addition, substantial evidence supports the ALJ's findings that Lyons' testimony on the frequency of his seizures was not credible, and that the seizures he did have were largely due to noncompliance with his prescribed medication. *See* R. 17-18. Pursuant to Social Security Ruling 87-6, the ALJ may consider that "predominant reason for low anticonvulsant blood levels is that the individual is not taking the drugs as prescribed." SSR 87-6. Further, the "blood levels of the anticonvulsive drugs may serve to indicate whether the prescribed medication is being taken." *Id.* The Regulation also provides that:

> Unless convincing evidence is provided that subtherapeutic blood drug levels are due to abnormal absorption or metabolism, and the prescribed drug dosage is not itself inadequate, the conclusion should follow that the individual is not complying with the treatment regimen. Similarly, in cases in which there is convincing evidence of

> intermittent noncompliance, including seizure activity because of alcohol abuse, little weight should be given to sporadically obtained anticonvulsant blood levels, even if they are in therapeutic range.

*Id.*

In this case, the ALJ carefully noted the reports of Dr. DeSai and the doctors at the Halifax Medical Center on Lyons' Tegretol and Dilantin levels during his various visits when Lyons complained of having seizures. *See* R. 16-18.  The ALJ also considered Dr. DeSai's notes that Lyons had a history of "irregular medication compliance," as well the Halifax Medical Center doctors' reports that Lyons was not compliant. *See* R. 17.  The ALJ concluded that "[a]s long as [Lyons] is medically compliant, break through seizures should be rare." R. 17.  The ALJ also found:

> [Lyons] could achieve better control over his seizures if he were compliant with his medical regimen, taking the proper dosages at the prescribed time . . . [Lyons'] history of alcohol and substance abuse . . . might result in seizure activity despite compliance . . . [but] the record reveals only suggestions, not a serious discussion, of the effect of alcohol.  Even if it were a factor, however, it would merely be more evidence of non-compliance with medical advice leading to seizures . . . .
> Exertionally, he does not have a limitation; non-exertionally he should observe seizure precautions.  Even if he is compliant with medical advice, he is at risk for break through seizures.

R. 18.

Substantial evidence shows that Lyons failed to take his medication as prescribed.  Most of the times he visited the Halifax Medical Center emergency room, Lyons' Tegretol blood levels were subtherapeutic. R. 210, 217, 292, 322, 328, 348, 358.  The emergency room doctors often noted that Lyons was noncompliant. *See* R. 343, 347, 359.  Dr. DeSai, Lyons's treating physician, noted during several visits that Lyons showed a history of alcohol and substance abuse and irregular compliance with prescribed medication.  R. 230, 233, 290, 399, 405.  Lyons admitted drinking alcohol and

smoking marijuana on several occasions.  R. 170, 246, 316, 343.  Accordingly, this Court will not disturb the ALJ's clearly articulated credibility finding.

4.    Lyons' Treating Physicians

Lyons also argues that the Commissioner improperly rejected the opinions of Dr. Carney ("Lyons' treating neurologist") and Dr. Dede ("Lyons' treating neuropsychologist").  Docket No. 31 at 9, 18.  The Commissioner counters that the ALJ properly evaluated the opinions of Lyons' treating physicians.  Docket No. 36 at 11-16.

Absent "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580.

Lyons first argues that Dr. Carney determined that Lyons' seizures "could not be controlled entirely with medication, and that Mr. Lyons might benefit from epileptic surgery to resolve his seizure disorder."  Docket No. 31 at 18 (underline emphasis omitted).  Lyons' summary of Dr. Carney's findings are not accurate.  Dr. Carney advised Lyons on his various treatment options, which included different medications, as well as surgery for epilepsy.  *See* R. 246.  Further, Lyons did not return to Dr. Carney (or Shands in general) after his evaluation in June 2000.  *See* R. 406.

Next, Lyons argues that the ALJ improperly rejected Dr. Dede's neuropsychological evaluation from February 2000.  Docket No. 31 at 20-21.  Lyons argues that Dr. Dede's evaluation shows that "Lyons' clinical picture was indicative of generalized cortical dysfunction" and that Lyons' borderline intellectual functioning impaired his abilities to work.  *Id.* at 18, 20-21.

-44-

Lyons is wrong.  First, Dr. Dede evaluated Lyons once as part of Dr. Carney's evaluation for surgery, but himself provided no treatment.  Also, the ALJ properly accepted Dr. Dede's own statements that the test results may not have been entirely accurate.  *See* R. 19; *see also* R. 316, 319. The ALJ noted that Lyons test scores for IQ tests administered by Dr. Graham and Dr. Oatley were significantly higher.  R. 19.

The ALJ stated "good cause" for rejecting Dr. Dede's opinions.  The ALJ, in fact, properly assigned controlling weight to Dr. DeSai's statements that Lyons was "fully functional"; that Lyons "is able to participate in all normal physical activities for his age"; and that Lyons "remains independent in his activities of daily living." R. 230.  The ALJ also properly relied on Dr. Graham's evaluation and assigned "significant weight" to Dr. Oatley's evaluation regarding Lyons' intellectual and social functioning.  *See* R. 19.  The ALJ stated the weights assigned and specific and adequate reasons for doing so for all of the various doctors' opinions, *see* R. 17-19, and remand is not required.

### 5.  Lyons' Residual Functional Capacity

Lyons also argues that the Commissioner's findings on Lyons' RFC are not based on substantial evidence . Docket No. 31 at 22-23.  The Commissioner counters that substantial evidence supports the ALJ's RFC findings.  Docket No. 36 at 17-18.

After a thorough review of the medical evidence, the ALJ found that Lyons could perform work at every level of exertion, except that he was limited to unskilled work activity and had to avoid driving, dangerous and moving equipment, and unprotected heights.  R. 20.  As discussed above, the ALJ properly rejected Lyons' testimony as to the frequency of his seizures.  Furthermore, substantial evidence supports the ALJ's finding that Lyons seizures were largely due to noncompliance (also

-45-

discussed above).  Several doctors, including Dr. DeSai, noted the Lyons was noncompliant with his medication.  The ALJ properly noted Lyons' subtherapeutic anticonvulsant levels during his hospital visits, *see* R. 17-18, and correctly concluded Lyons was noncompliant.

The ALJ's RFC finding properly accounted for Lyons' intellectual limitations by limiting him to unskilled work.  The ALJ also accounted for Lyons' seizure disorder by imposing environmental restrictions.  Substantial evidence supports the ALJ's RFC finding.

6.      Hypothetical Question Posed to the Vocational Expert

Finally, Lyons claims that the Commissioner erred by failing to meet her burden to demonstrate that Lyons could perform other work.  Docket No. 31 at 3, 22-23.  The Commissioner argues that the ALJ's hypothetical question to the VE accurately captured Lyons' impairments and limitations.  Docket No. 36 at 18-19.

Reliance on VE testimony is proper where the hypothetical questions posed by the ALJ accurately depict a claimant's impairments.  In this case, the ALJ correctly recognized that Lyons' non-exertional impairments precluded the use of the grids to establish that Lyons could perform other work that exists in the national economy, and thus relied on VE testimony.  *See* R. 19, 20.

During Lyons' December 22, 2001 hearing, the ALJ asked VE McKay hypothetical questions that described work restrictions similar to Lyons' and to the ALJ's articulated RFC Finding.[12] R. 482-83. The VE listed three jobs existing in the national economy that Lyons could perform. R. 483.

In addition, upon cross examination by Lyons' counsel, the VE testified that Lyons would be able to perform these jobs even if he had two or three seizures every six months, and had to miss one day of work for each seizure. R. 487-88[13] (testifying "that's within normal tolerances of the absenteeism"). The VE also testified that even if Lyons needed "extra time with assignments," Lyons would be able to perform these jobs. *See* R. 494. As discussed earlier, substantial evidence supports the ALJ's RFC finding and the finding that if Lyons were compliant with his medications, breakthrough seizures would be "rare." Substantial evidence supports the ALJ's hypothetical to VE

---

[12]The ALJ asked the VE to:

Assume an individual of 20 years of age, he completed high school in special education classes. He can read a newspaper, can write a letter, he can do simple addition. Assume the work background and skill level which you have identified. Assume he can sit, stand and walk without limitation, can perform postural activities and the physical functions of work without limitation. He must avoid driving dangerous and moving equipment and unprotected heights. He is limited to unskilled activities. Can you identify any jobs he could perform?

R. 482-83.

[13]Lyons' counsel asked the VE if "in any of these jobs, can someone who has epilepsy, [grand mal] epileptic seizures like Mr. Lyons[,] perform these jobs well enough to stay on for over six months?" R. 487. The VE responded:

I don't think the seizures themselves would be the issue, I think the issue is how much work you would miss because of the seizures. I'm going back to [Lyons'] testimony and I don't want to put words in his mouth, but I've got the impression that he had two or three every six months, I don't know if that's correct or not but I thought that's what I heard.

*Id.* Lyons stated: "(INAUDIBLE) six months." *Id.* The VE then responded: "Every six. So I think – let's just say he missed a whole day I think that would be within the tolerance of the . . . employer." *Id.* The VE later added that he was assuming that a grand mal seizure "would knock out a whole day" and repeated that he thought "that's within normal tolerances of the absenteeism." R. 487-88.

McKay,[14] and the Commissioner met her burden to demonstrate that Lyons could perform other work in the national economy.   Remand is unnecessary.

## VI.    **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.   The Clerk should enter a judgment and close the case.

**DONE AND ORDERED** this 28th day of March, 2007.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL               33602

---

[14]The ALJ did not question VE Collins at the third ALJ hearing, but rather, offered Lyons' counsel the opportunity to question VE Collins in light of the additional medical records. *See* R. 524-26.

The Honorable Linda R. Haack
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817